1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                          NORTHERN DISTRICT OF CALIFORNIA

9

10

11    MITCHELL TATMON,                              No. C 09-0094 WHA (PR)

12              Petitioner,                         **ORDER DENYING PETITION FOR
                                                    WRIT OF HABEAS CORPUS**
13        v.

14    JOHN W. HAVILAND, Warden,

15              Respondent.
      _____/
16

17                                **INTRODUCTION**

18        This is a federal habeas corpus action filed pursuant to 28 U.S.C. 2254 by a *pro se*

19    state prisoner.  For the reasons set forth below, the petition is **DENIED**.

20                                **BACKGROUND**

21        In 2004, an Alameda County Superior Court jury convicted petitioner of carjacking,

22    second-degree burglary, false imprisonment, and second-degree robbery.  The jury also

23    found true allegations that petitioner had used a knife in the commission of the crimes and

24    had six prior convictions, three of which were strikes.  Consequent to the verdicts, the trial

25    court sentenced petitioner to 93 years-to-life in state prison.[1]  Petitioner filed the instant

26    federal habeas petition after he was denied relief on direct state review.  It appears that

27    petitioner did not seek state habeas relief.

28    _____

              [1]  The Honorable Leo Dorado served as trial judge.

United States District Court
For the Northern District of California

Evidence presented at trial demonstrated that in August 2003, petitioner approached the victim Jane Doe as she entered a pottery studio after parking her car.  Petitioner gained entry to the studio by saying that he wanted to look at a Jamaican artist's work at the studio:

> Doe [ ] said, "Why don't you take a look," and "I have to go in back for . . . a couple minutes."  She left, through the swinging doors, and checked her work in one of the kilns . . . After three or four minutes, Doe reentered the studio and found [petitioner] standing in a corner, no longer looking at the Jamaican work. She walked past him at two to three feet distance and, said without stopping, "I have to go now."  She saw in his eyes a cold, hard look, not that of the man she thought she had let in, and kept walking toward the front door, thinking she had better get out of there.  Passing him, Doe saw out the corner of her eye a quick gesture and felt him grab her from behind with his left arm around her neck and, with his right, pressing a knife blade to her right side.  It was a hard choke hold, leveraged with his hand grabbing her right shoulder, and caused her to black out for a few seconds, and she saw at some point that the knife was a folding type with a blade two and a half to three inches long.  [Petitioner] said, "Do what I say, and you won't get hurt," and pushed her from behind into the restroom.  Doe stood there, facing the wall, fearing for her life.  [Petitioner] demanded, "I want your purse," but she said she had not brought it.  Asked if it was in her car, she said: "It isn't in my car.  I didn't bring a purse.  And I have my keys.  You can go look."  She pulled out and held up keys from her right pants pocket, and he grabbed them.  Worried that she had no purse to give him and remembering that she had some money in her left pocket, she told him that she had some.  "About $40," she said when he asked, "How much?"  She reached into her left pocket and pulled out the cash together with a combined ATM/credit Versatel card.  He grabbed those and then ordered her to take off all her clothes.
>
> "Are you going to rape me?" she asked, and he said, "No, I'm not going to rape you."  Then after a pause of a few seconds, he said: "You don't have to take off your clothes . . . I'm going to tie you up."  Doe next heard behind her what sounded like duct tape being ripped.  [Petitioner] gripped her shoulder or upper left arm with his left hand as he did this.  She could not see what he was doing, but he tied each of her hands separately, and then together, crossed at the wrists behind her back.  He ordered her to lie down, and she knelt instead, still facing the wall.  He tied her feet in the same manner, each separately and then together, crossed at the ankles.  He told her not to look at him, but she did, three or four times, "trying to make eye contact with him to try to change the situation" and make him less hostile.  He was breathing heavily but seemed to have no difficulty and to know what he was doing.
>
> [Petitioner] said "I'm going to be watching you from across the street" and, Doe saw with a backward glance, was using cloth to wipe off the door handle. He also said, "I'm going to get you some help," before leaving, turning off the light and shutting the door, leaving her in the dark.

(Ans., Exh. C at 2–4).  Petitioner's DNA was found on a bathroom towel at the pottery studio (*id.* at 4, 5).

United States District Court
For the Northern District of California

1    Petitioner testified at trial:

2    He admitted jury trial convictions in 1992 for felonies of moral turpitude
     ("[d]ishonesty," jurors were told) against [a 42 year old woman,] D.M.[,] and
3    having moral-turpitude felonies from 1990 and 1986. However, while
     conceding that D.M. identified him in a lineup and that a jury found him guilty
4    for those offenses, he denied going into the recreation center and robbing and
     tying up D.M. [¶] . . . In the end, he simply denied attacking or robbing Doe on
5    August 30, 2003, and gave an alibi account of various things he had done that
     and the previous day with numerous people. [¶] To account for his DNA
6    being on the [pottery studio's] towel, he claimed that he used one there to dry
     his hands in the restroom the day before, Friday, August 29.

7

8    (*Id.* at 9).

9         D.M. testified at trial regarding the 1991 incident. The factual summary that follows

10   is based on her testimony. In 1991, she worked at a community safety center. Petitioner

11   visited her work several times before he committed the crimes against her. On his third visit,

12   petitioner came in with a four-year-old boy, and asked D.M., who remembered seeing

13   petitioner at her office on his first two visits, about working as a volunteer for her program.

14   On his fourth visit, he asked D.M. about renting a hall for a surprise party. On his fifth visit,

15   petitioner again talked to D.M. about renting a hall. As she took petitioner to see the room,

16   he placed her in a choke hold, pressed a knife against her neck, tied her up, and robbed her

17   (*id.* at 7–9).

18        As grounds for federal habeas relief, petitioner alleges that (1) admission of

19   evidence of a 1991 crime violated his due process rights; (2) the prosecutor committed

20   misconduct with respect to the evidence of the 1991 crime; (3) the trial court's use of

21   CALJIC No. 2.03 as an improper pinpoint jury instruction violated due process; and (4) the

22   trial court's use of CALJIC 2.90 violated due process.

23                              **STANDARD OF REVIEW**

24        A federal habeas court will entertain a petition for a writ of habeas corpus "in behalf

25   of a person in custody pursuant to the judgment of a State court only on the ground that he

26   is in custody in violation of the Constitution or laws or treaties of the United States." 28

27   U.S.C. 2254(a). The court may not grant a petition with respect to any claim that was

28   adjudicated on the merits in state court unless the state court's adjudication of the claim

3

"resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" 28 U.S.C. 2254(d)(1).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. (Terry) Taylor*, 529 U.S. 362, 412–13 (2000). "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413.

A federal habeas court may also grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254 (d)(2). The court must presume as correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. 2254(e)(1).

The state court decision to which section 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Nunnemaker* at 801–06; *Shackleford v. Hubbard*, 234 F.3d 1072, 1079, n. 2 (9th Cir. 2000). Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. *See Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an

1    unreasonable application of clearly established federal law. *Ibid.*

2          If constitutional error is found, habeas relief is warranted only if the error had a

3    "'substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v.*

4    *Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 638

5    (1993)).

6                                    **DISCUSSION**

7    **1.    Admission of Evidence of the 1991 Offense**

8          Petitioner claims that the trial court violated his right to due process when it

9    admitted evidence of prior similar offenses petitioner had committed in 1991.  Petitioner

10   contends that such evidence was so inflammatory as to render his trial fundamentally unfair

11   in violation of due process (Pet., P. & A. at 4–6).

12         At trial, evidence was presented that in 1991, petitioner attacked, held at knife-point,

13   tied up, and robbed a woman, D.M., while she was alone in her office.  The trial court

14   instructed the jury that such evidence was presented to show a common scheme or plan,

15   intent or motive between the 1991 and currently charged offenses.  The jury was also

16   instructed that such evidence should not be considered as proof that petitioner had a

17   propensity to commit the charged offenses (Ans., Exh. C at 6).

18         The state appellate court rejected petitioner's claim that the trial court erred in

19   admitting such evidence.  The similarities between the two crimes, according to the state

20   appellate court, justified the introduction of the 1991 crime to show a similarity of intent:

21         Both victims were older women (aged 42 and 61); the premises were
          commercial; the assailant cased the premises beforehand; he used a
22        business-related pretense to gain access and put the women at ease, ostensibly
          going to look at something he was interested in; he struck when the women
23        were alone and had returned from another room; he grabbed each from
          behind, put them in a choke hold with his left arm while brandishing a knife
24        in his right hand; he pushed them in that position to a more secluded room; he
          tied them up, hands and ankles, with whatever material was on hand, using
25        the knife to cut down or fashion his restraints; he took their credit cards, cash
          and/or other valuables; and he took their keys and fled in their cars. There
26        were also sexual components to each assault.[2]  After riding D.M., Tatmon
          pulled up her skirt and slip, pulled down her panties and hose, and tried to
27        penetrate her from behind as she lay tied and prone on the floor; the assailant

28   _____

          [2]  The trial court expressly disallowed any reference "to the sexual assault on D.M."
     (Ans., Exh. C at 17).

United States District Court
For the Northern District of California

1    here had ordered [Jane] Doe to strip but then relented when she resisted.

2    (Ans., Exh. C at 13–14).[3]

3         "A habeas petitioner bears a heavy burden in showing a due process violation based

4    on an evidentiary decision." *Boyde v. Brown*, 404 F.3d 1159, 1172 (9th Cir. 2005).  In fact,

5    the Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly

6    prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the

7    writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's

8    admission of irrelevant pornographic materials was fundamentally unfair" under Ninth

9    Circuit precedent but not contrary to, or an unreasonable application of, clearly established

10   Federal law under § 2254(d)).  Also, significantly, habeas relief may be granted only if

11   there are no permissible inferences that the jury may draw from the evidence.  *See Jammal*

12   *v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.1991).

13        Petitioner's claim is foreclosed by caselaw.  First, the Supreme Court has not

14   established that the admission of prejudicial evidence constitutes a due process violation

15   sufficient to warrant federal habeas relief.  *Holley*, 568 F.3d at 1101.  As the right is not

16   clearly established, petitioner has not shown that the state court's decision regarding the

17   allegedly prejudicial evidence was contrary to, or involved an unreasonable application of,

18   clearly established federal law.  Second, it was permissible for the jury to infer from

19   petitioner's 1991 acts that he had the intent to commit the crimes charged, considering that

20   intent is certainly an element of such offenses.[4]  As the jury could draw a permissible

21   inference of intent from the evidence, no due process violation occurred.  Third, the Ninth

22   Circuit has upheld as constitutional the admission of prior bad act evidence where, as here,

23

---

24   [3]  "Defense counsel offered to remove the burglary intent issue through a "conditional
     plea" by which [petitioner] would plead guilty to that charge, conditioned on him later being
25   found guilty of the other offenses.  The "conditional" aspect was to avoid exposure to a
     third-strike life sentence, but when asked for authority for such a plea, defense counsel said he
26   had none.  The court said that if only the other charges were at issue, it "clearly could potentially
     affect" its ruling.  Defense counsel had no authority, however, and the prosecutor added he
27   would never agree to one.  The court invited an unconditional burglary plea, but the defense
     declined" (Ans., Exh. C at 14).
28
     [4] For example, a person is guilty of burglary if he enters a dwelling "with intent to commit
     grand or petit larceny or any felony."  Cal. Pen. Code § 459.

6

the evidence was admitted to show intent, and was coupled with limiting instructions. *See Houston v. Roe*, 177 F.3d 901, 909 n.6 (9th Cir. 1999). Indeed, the trial court gave careful instructions to the jury about how the evidence should be viewed. Jurors are presumed to follow their instructions. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987). Also, the trial court restricted the form of the evidence so as to minimize or eliminate facts irrelevant to intent or that may have been inflammatory. For example, it disallowed any mention of the sexual nature of the offense against D.M. as irrelevant to the question of intent. Taking all these factors into consideration, petitioner's claim fails. Accordingly, petitioner's claim is DENIED because he has failed to show that there was "no reasonable basis for the state court to deny relief," *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011), that is, he has not shown that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.

**2.    Alleged Prosecutorial Misconduct**

Petitioner claims that the prosecutor committed misconduct, thereby rendering the trial fundamentally unfair in violation of due process. According to petitioner, the prosecutor committed misconduct when he (A) implied in his opening statement that petitioner had committed other crimes; (B) elicited inflammatory and irrelevant testimony from D.M.; and (C) used that wrongly elicited testimony as propensity evidence (Pet., P. & A. at 1).

**A.    Opening Statement**

Petitioner objects to the prosecutor's having thrice stated that he could talk only about one prior criminal incident in order to prove certain elements of the charged offenses:

> The prosecutor's opening statement prompted a defense objection and, afterward, an assertion of misconduct, and a motion for mistrial or curative admonition that was heard and denied outside the jury's presence. The issue was prosecutor Brian Owens telling jurors that, to help prove burglary intent, he would be putting on evidence of "one," "[o]nly one," or "just this one" prior similar incident.

> Owens . . . introduced the prior incident this way (parts later objected to italicized): "The one sort of thing that remains in terms of me having to prove this case is why did he go in the building? Because for burglary, you have to show that somebody went into a building in part to commit a felony

or commit theft.  What the evidence shows is he goes in the building to look at Jamaican pottery.  That's what he tells the victim, right?  On that evidence, I might have a difficult time proving to you he, actually, went into the building to tie the victim up to commit a robbery.  And to help prove that to you, the Court, in its discretion, has allowed me to introduce *one prior incident by this [petitioner].  Only one.  And I can only talk about it in a very limited way*.  And the reason why this particular prior incident that the [petitioner] has committed is being introduced is it's so similar to our case." . . . .

Owens then closed his statements this way (objected-to parts again italicized):  "Now, as I mentioned to you, I'm only able to talk about *just this one incident* and only in a very limited way in terms of, uh, being able to hear the victim, and that is to show that in this case that you're sitting on right here, he didn't go in to look at Jamaican pottery.  He went in to rob and terrorize a woman just as he had done before . . . And I hope that just with this current incident you're going to hear about, *and this one incident from the past* you're going to hear about, that you will see that this is a very violent, dangerous man.  [¶]  And it is important, once you hear all this evidence and you're instructed on the law, that you will see that the law, when applied to the facts, will prove his guilt beyond a reasonable doubt."

(Ans., Exh. C at 18–19).

The state appellate court rejected petitioner's misconduct claims:

"Only one" . . . [when read] in the context of having just gone in detail into many witnesses and other sources of evidence for the current charges, the prosecutor could have been reacting to a sense, or even a look from a juror, that the prospect of hearing about a prior incident as well would be unwelcome.  "Only one," in other words, would have been an assurance of brevity, and this comports with the prosecutor's explanation that he was just trying to outline the evidence and tell jurors they were "going to hear about one incident, and that's all," to assist in proving burglary intent.

(*Id.* at 20).

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness so that there was a due process violation.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  In order to prevail on federal habeas review, the prosecutor's misconduct must have resulted in prejudice, that is, the misconduct must have had a substantial and injurious effect or influence in determining the jury's verdict.  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

This order must respectfully disagree with the state court as to how these comments were intended or understood.  The message was that there were several other prior crimes but the prosecutor had been restricted to using only one.  This was prosecutorial misconduct.  Nonetheless, even if the remarks were improper, petitioner has not shown that he suffered prejudice.  The prosecutor gave no information on any other crimes.  That is, he did not say how many other crimes petitioner may have committed, what sort of crimes these were, whether charges were filed, what evidence supported the charges, or whether petitioner was in fact convicted.  And, the evidence against petitioner — the presence of his DNA on the towel and the testimony of Jane Doe — formed a strong prosecution case.  Accordingly, petitioner's claim is DENIED because he has failed to show that there was "no reasonable basis for the state court to deny relief," *Richter*, 131 S. Ct. at 784, that is, he has not shown that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.

**B.     Eliciting Testimony**

Petitioner claims that the prosecutor committed misconduct by eliciting inflammatory and irrelevant testimony from D.M. (Pet., P. & A. at 1).  According to petitioner, by eliciting such testimony, the prosecutor impermissibly tried to make D.M. a sympathetic figure to the jury (*ibid.*).

D.M. testified as a prosecution witness:

> [The prosecutor] began his direct examination of D.M. by establishing where, in what capacity, and with what duties she was employed at the time of the 1991 assault.  D.M. answered, among other things, that she was Executive Director for Community Safety Project for East Contra Costa County, that she "wore a second hat as Director for the CAP, Child Assault Prevention," also for East Contra Costa County, and that she had responsibility for implementing six programs for the Community Safety Project.  Asked what those programs were, D.M. named some, including the CAP program, which had 17 facilitators in the schools "to teach kids how to be safe and how to respond if anything negative happened to them."  When [the prosecutor] next asked, "What other programs were you responsible for in that capacity?" Steckler objected, "Relevance, Your Honor," and the court overruled the objection.  D.M. continued for one page of the transcript, describing having written a police training manual for a program called My Safe Haven, for children who were abused, molested, abandoned, or "in any dire distress" situation.  There was no further objection at that point, but the court said, "I think we can move on," whereupon [the prosecutor] asked D.M. about the

1    buildings where she worked.

2  (Ans., Exh. C at 21).

3        Petitioner also claims that the prosecutor committed misconduct when he elicited

4  two statements from D.M. about her visit to a psychiatrist after the 1991 assault, in

5  connection with a worker's compensation issue.  The first statement was, "[t]he psychiatrist

6  said I had rage, and [that during the attack] I was trying to figure out a way to kill him" (*id.*

7  at 23).  The second is: "After this incident, actually, workers' comp decided what had

8  happened to me wasn't enough to disable me, so they, actually, had me go to one, two —

9  two psychiatrists and then to a group, and they all said the same thing" (*ibid.*).

10        The state appellate court rejected petitioner's misconduct claim.  It found that

11  D.M.'s testimony regarding her work was relevant to introduce the witness to the jury, and

12  to explain "how and why she came to be where she was when assaulted by [petitioner]"

13  (*id.* at 22).  It also found that her testimony regarding her visit to a psychiatrist relevant to

14  ask her state of mind during and after the attack, and how the attack affected her (*id.* at

15  23).

16        Petitioner has not shown that he is entitled to habeas relief on these claims.  First,

17  petitioner has not shown that these remarks were improper.  The record fairly supports the

18  state appellate court's conclusion that the prosecutor's questions were relevant rather than

19  improper.  Her employment information was relevant because petitioner had used the

20  circumstances of her employment to gain access to her.  He took a child to her as part of a

21  ploy to disarm her, and to gain knowledge of her workplace and work schedule.  Her

22  statements to her psychiatrist were relevant to establish elements of the crimes, specifically

23  that she was in fear.  Second, even if the remarks were improper, petitioner has made no

24  showing of prejudice.  Petitioner admitted that he committed a crime of moral turpitude

25  against D.M., and her negative reaction to such an act would act as no surprise or prejudice

26  to petitioner's defense.  While the conditions of D.M.'s job might cause the jury to have

27  some sympathy with her, petitioner has not shown that this would be sufficient to overcome

28  the strong evidence of his being guilty of the charged offenses.  Accordingly, petitioner's

claim is DENIED because he has failed to show that there was "no reasonable basis for the state court to deny relief," *Richter*, 131 S. Ct. at 784, that is, he has not shown that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.

## C.    Propensity Closing Argument

Petitioner claims that the prosecutor committed misconduct by implying in his rebuttal argument that petitioner has a propensity to commit crimes (Pet., P. & A. at 1). The most striking example of this alleged misconduct was this statement:  "And it's very difficult for me to try to communicate to you, when all I get to do is put on the victim for as long as her testimony lasts, and then she has to leave, to communicate to you how dangerous a person is and how different he is when he's outside this building where there isn't a [b]ailiff.  And he's a much greater threat to women, because he commits crimes against women" (Ans., Exh. C at 24).  The state appellate court rejected this misconduct claim, finding that any propensity commentary was "brief, and mixed with proper argument" (*id.* at 25).

This order finds this argument to have been improper.  Nonetheless, petitioner's claim cannot succeed.  First, as noted above, the trial court had instructed the jury that it was to use the testimony regarding the 1991 assault as intent, not propensity, evidence. The trial court also instructed the jury that it must follow the instructions of the trial court, that the comments of counsel are not evidence, and that counsels' instructions were to be disregarded if the conflicted with the court's instructions (Ans., Exh. A at 1–2).  Jurors are presumed to follow their instructions.  *See Marsh*, 481 U.S. at 206.  Petitioner's mere allegations are insufficient to overcome this presumption.

Second, the Supreme Court has left open the question of whether admission of propensity evidence violates due process.  *Estelle v. McGuire*, 502 U.S. 62, 75 n. 5 (1991). Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA.  *Alberni v. McDaniel*, 458 F.3d

11

860, 866–67 (9th Cir. 2006).  By way of analogy, if it is an open question whether the admission of propensity evidence violates due process, then alleged propensity statements by the prosecutor cannot be the basis for relief under AEDPA.  Accordingly, petitioner's claim is DENIED because he has failed to show that there was "no reasonable basis for the state court to deny relief," *Richter*, 131 S. Ct. at 784, that is, he has not shown that the state court's decision was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.

**3.     CALJIC No. 2.03**

Petitioner claims the trial court violated his right to due process by giving the jury CALJIC No. 2.03, which, as read to petitioner's jury, reads as follows:

> If you find that before the trial the [d]efendant made a willfully false or deliberately misleading statement concerning the crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt.  However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide.

(Ans., Exh. B at 1954).  As to the specifics of his claim, petitioner refers the Court to his argument as stated in the state appellate opinion:  "[Petitioner] does not dispute the evidentiary support for this instruction but contends that it violated his due process rights as an improper 'pinpoint' instruction that highlighted particular evidence, rather than a legal theory" (*id.*, Exh. C at 26).  The state appellate court rejected this claim on state law grounds (*ibid.*).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  *Ibid.*  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  *United States v. Frady*, 456 U.S. 152, 169 (1982).

1    "[CALJIC No. 2.03] is proper in cases in which there is testimony indicating that

2    before trial the defendant had made several statements, relating to the crime, which were

3    inconsistent with each other." *Turner v. Marshall*, 63 F.3d 807, 819–20 (9th Cir. 1995)

4    (citations removed) (overruled on other grounds by *Tolbert v. Page*, 182 F.3d 677 (9th Cir.

5    1999) (en banc)).

6         Petitioner is not entitled to habeas relief on this claim.  Firstly, as petitioner

7    conceded to the state appellate court, there was a proper factual basis for the instruction.

8    Secondly, this Court is bound by the Ninth Circuit's holding in *Turner*.  Accordingly,

9    petitioner's claim is DENIED because he has failed to show that there was "no reasonable

10   basis for the state court to deny relief," *Richter*, 131 S. Ct. at 784, that is, he has not shown

11   that the state court's decision was contrary to, or involved an unreasonable application of,

12   clearly established Supreme Court precedent.

13   **4.    CALJIC No. 2.90**

14        Petitioner claims the trial court violated his right to due process and equal

15   protection by giving the jury CALJIC No. 2.90, which, as read to petitioner's jury, was as

16   follows:

17        A defendant in a criminal action is presumed to be innocent until the contrary
          is proved, and in case of a reasonable doubt whether his guilt is satisfactorily
18        shown, he is entitled to a verdict of not guilty.  This presumption places upon
          the People the burden of proving him guilty beyond a reasonable doubt.
19
20        Reasonable doubt is defined as follows:  It is not a mere possible doubt;
          because everything relating to human affairs is open to some possible or
          imaginary doubt.  It is that state of the case which, after the entire comparison
21        and consideration of all the evidence, leaves the minds of the jurors in that
          condition that they cannot say they feel an abiding conviction of the truth of
22        the charge.

23   (Ans., Exh. B at 1961–62).  As to the specifics of his claims, petitioner refers the Court to

24   his arguments as stated in the state appellate opinion:

25        [Petitioner] claims the instruction denied him federal due process because use
          of the term abiding conviction "without the qualifying phrase, 'to a moral
26        certainty,' incorrectly state[d] the reasonable doubt standard," connoting only
          an unchanging strong belief, a standard more akin to clear and convincing
27        proof.
          . . . .
28

13

United States District Court
For the Northern District of California

1
2
3

> [Petitioner] also claims that the instruction denied him equal protection because "it provided no adequate and uniform standard for determining the level of certainty to which the jury must be persuaded, and individual jurors were free to apply different standards."

4   (*id.*, Exh. C at 29).  The state appellate court rejected both claim on state law grounds.

5   (*ibid.*).

6        Petitioner's due process claim is foreclosed by caselaw.  The version of CALJIC No.

7   2.90 read to petitioner's jury was upheld as constitutional in *Lisenbee v. Henry*, 166 F.3d

8   997, 999– 1000 (9th Cir. 1999) (use of term "abiding conviction" in defining reasonable

9   doubt is constitutionally sound).

10        Petitioner's equal protection claim is facially insufficient.  The Equal Protection

11   Clause "is essentially a direction that all persons similarly situated should be treated alike."

12   *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).  In this claim,

13   petitioner has not even alleged that he is being treated differently than any similarly-

14   situated person.  Rather, his equal protection claims appears to be a rephrasing of his due

15   process claim.  Accordingly, petitioner's claim is DENIED because he has failed to show

16    that there was "no reasonable basis for the state court to deny relief," *Richter*, 131 S. Ct. at

17   784, that is, he has not shown that the state court's decision was contrary to, or involved an

18   unreasonable application of, clearly established Supreme Court precedent.

19                                              **CONCLUSION**

20        The state court's adjudication of petitioner's claims did not result in a decision that

21   was contrary to, or involved an unreasonable application of, clearly established federal law.

22   Nor was the decision based on an unreasonable determination of the facts in light of the

23   evidence presented in the state court proceeding.  Accordingly, the petition is **DENIED**.

24   //

25   //

26   //

27   //

28   //

Reasonable jurists, however, would find the order's assessment of the following claim debatable: that the prosecutor committed misconduct when he thrice stated that he could talk about only one prior criminal incident. Accordingly, a certificate of appealability is GRANTED as to that issue only. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). A certificate of appealability is DENIED as to all other claims.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated: June  13 , 2011

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California

15